UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Kimberly L. Jackson, Administratrix | ) | Civil Action No.: 4:16-cv-03219-RBH |
| of the Estate of Jerry D. Jackson, Jr., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **FINDINGS OF FACT, CONCLUSIONS** |
| | ) | **OF LAW, AND ORDER** |
| United States of America, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff Kimberly L. Jackson ("Plaintiff"), who represents the estate of her deceased husband

Jerry D. Jackson, Jr. ("Mr. Jackson"), brings this negligence and wrongful death action against the

United States pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671–2680. The Court

held a bench trial on February 20–23, 2018, and now issues this order summarizing its evidentiary

rulings and setting forth its findings of fact and conclusions of law.

## Introduction

This case arises from the tragic death of Plaintiff's husband, Jerry D. Jackson, Jr., who passed

away in a motorcycle accident on September 12, 2015. As Mr. Jackson and nine other motorcyclists

were traveling home to North Carolina on U.S. Highway 701 North in Horry County, South Carolina,

a rural mail carrier employed by the United States Postal Service entered the northbound lane from a

private drive. As a result, two motorcyclists in front of Mr. Jackson collided with the postal employee's

vehicle, and Mr. Jackson, who did not come into contact with the postal employee's vehicle, was

ultimately ejected from his motorcycle and died at the scene.

## Evidence Presented

At trial, Plaintiff offered testimony from seven of the nine motorcyclists who were riding with

Mr. Jackson at the time of the accident and are listed in the order they testified: **Woody Hodges** (who testified by written deposition), **Ron McLeod**, **Patrick Burgess**, **Paul Godwin**, **William Strickland**, **Roy (Joe) Joffrion**, and **Harry Halstead**. Plaintiff also called the following witnesses: **Tony Howard**, an independent unbiased witness who was riding behind the ten motorcyclists in his SUV at the time of the accident and had been following them for several miles; **Cpl. Christopher Costa**, a trooper with the South Carolina Highway Patrol who responded to the scene and investigated the accident; **Jessica Williams**, a family friend of the Jacksons who testified regarding wrongful death damages of the family; **Dr. Jesse Raley**, an expert in forensic psychiatry who evaluated two of the statutory beneficiaries; **Michelle McSpadden**, the Horry County Deputy Coroner who responded to the scene and investigated Mr. Jackson's death; **Alan Campbell**, an expert in civil engineering and human factors; **Jerri McLamb**, Plaintiff's sister-in-law; **Kimberly Jackson**, Mr. Jackson's surviving wife and the plaintiff in this case; **Cacey Jackson**, Mr. Jackson's surviving elder son; **Hunter Jackson**, Mr. Jackson's surviving younger son; **Dewayne Stancil**, a family friend of the Jacksons; **Dr. Oliver Wood, Jr.**, an economic loss expert; and **Carolyn Cole**, the rural mail carrier employee involved in the accident.

Defendant offered testimony from **Erin Higinbotham**, an expert in mechanical engineering with qualifications in accident reconstruction and motorcycle operations; **Dr. Marc Glaser**, the former Emergency Services Medical Director for Harnett County, North Carolina; and **Kendrick Richardson**, an expert in mechanical engineering with qualifications in accident reconstruction and vehicle dynamics.

In addition to the testimony, the Court has carefully reviewed the numerous exhibits submitted by the parties.

# Evidentiary Issues

## I.    Admissibility of Motorcyclist Literature

Plaintiff filed a motion in limine seeking to limit and/or exclude the testimony of Defendant's experts regarding the North Carolina Motorcyclists' Handbook, the Motorcycle Safety Foundation Operator Manual, and the related Motorcycle Safety Foundation Riding Tips document. *See* ECF No. 50; *see also* Def. Exs. 56, 57, & 58. Plaintiff objected to these materials being admitted into evidence and to any testimony (expert or otherwise) about them, asserting the accident at issue occurred in South Carolina and thus is subject only to South Carolina motor vehicle law. *See* ECF No. 50-1. Defendant filed a response in opposition arguing these publications were relevant and were properly relied upon by its two expert engineer witnesses, Erin Higinbotham and Kendrick Richardson, to establish the industry standard for safe motorcycle group riding. *See* ECF No. 52.

The Court addressed the motion before trial began, noting the case was a nonjury/bench trial and ruling it would permit Defendant's experts to testify about their reliance on the publications and to give their opinion as to whether or not Mr. Jackson was operating his motorcycle in a safe manner. However, the Court noted it would reserve the right to disregard such expert opinions.

Having fully considered this issue and heard the disputed testimony, the Court reaffirms its prior ruling regarding those portions of the publications relied upon by Defendant's experts. First, those particular portions are admissible under Federal Rules of Evidence 402 and 403. Second, Higinbotham's and Richardson's expert opinions relying on these publications are admissible under Rule 703.[1] Initially, the Court notes the typical concerns contemplated by Rule 703 were not at play

---

[1] Rule 703 provides, "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their

in this bench trial. *See Williams v. Illinois*, 567 U.S. 50, 69 (2012) (discussing Rule 703 and explaining that "[w]hen the judge sits as the trier of fact, it is presumed that the judge will understand the limited reason for the disclosure of the underlying inadmissible information and will not rely on that information for any improper purpose").

Furthermore, the publications were reasonably relied upon by Higinbotham and Richardson in forming their opinions about Mr. Jackson's following distance and whether it was a cause of his fatal injuries. As Defendant correctly points out, *see* ECF No. 52 at p. 3, all ten riders were residents of North Carolina with motorcycle endorsements on their driver's licenses, and this case requires an understanding of the industry standard for safe motorcycle group riding, a matter outside the layman's common knowledge or experience.[2] *See Babb v. Lee Cty. Landfill SC, LLC*, 747 S.E.2d 468, 481 (S.C. 2013) (explaining that in the context of negligence and causation, "[t]he general rule in South Carolina is that where a subject is beyond the common knowledge of the [factfinder], expert testimony is required"); *Green v. Bradley Co.*, No. 3:15-CV-02581-JMC, 2017 WL 4012298, at *5 (D.S.C. Sept. 12, 2017) (quoting *Babb* in a diversity case). Moreover, these publications aid Defendant's experts in establishing the standard of care that Mr. Jackson—a North Carolina motorcyclist— should have been using and whether he deviated from that standard of care because, as explained below, this case involves comparative negligence. *See generally Doe ex rel. Doe v. Wal-Mart Stores, Inc.*, 711 S.E.2d 908, 912 (S.C. 2011) ("Once a duty has been established, it is the further function of the court to

---

probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703.

[2] Notably, the Court asked Plaintiff's counsel if any of them rode motorcycles, and all four of them responded they did not. The undersigned likewise does not ride a street motorcycle. The Court makes this point merely to illustrate why the publications at issue aid a factfinder in understanding the relevant standard of care for a motorcyclist.

determine and formulate the standard of conduct to which the duty requires the defendant to conform. The factfinder may consider relevant standards of care from various sources in determining whether a defendant breached a duty owed to an injured person in a negligence case. The standard of care in a given case may be established and defined by . . . ***industry standards*** . . . ." (internal citations and quotation marks omitted) (emphasis added)).

Finally, the Court notes those relevant portions of the three publications—the North Carolina Motorcyclists' Handbook, the Motorcycle Safety Foundation Operator Manual, and the Motorcycle Safety Foundation Riding Tips document—can be read harmoniously with South Carolina law and the South Carolina Driver's Manual that was also relied upon by Defendant's experts. *See* Def. Ex. 55. Accordingly, the Court **DENIES** Plaintiff's motion in limine.

## II.     Testimony of Dr. Oliver Wood, Jr.

At the end of trial, Defendant renewed its *Daubert*[3] motion to exclude the testimony of Dr. Oliver Wood, Jr., Plaintiff's economic loss expert. The Court had previously denied the motion in a text order on October 26, 2017. *See* ECF No. 35 ("[T]he [C]ourt respectfully denies Defendant's motion to exclude the testimony of Dr. Wood. Because this case will be tried non-jury, the Court would prefer to hear the disputed testimony before it makes a decision whether to exclude or disregard any part or all of the testimony."). Having now heard Dr. Wood's testimony, the Court finds it proper to disregard his conclusions and opinions only to the extent they are based on an assumed earning capacity of $48,000 per year because, as explained later in this Order, this figure is *too speculative* to be considered as *reliable* information consistent with *Daubert* principles and Federal Rule of Evidence 702. The Court will, however, consider Dr. Wood's testimony concerning the projected loss of Mr.

---

[3]     *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

Jackson's household/family services. The Court's relevant findings are set forth in detail below.

## Legal Standard for a Nonjury Civil Trial

"In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1).

Although Plaintiff and Defendant both moved for "directed verdicts,"[4] there is no such motion in the Federal Rules of Civil Procedure. *See Benjamin v. Shaw*, No. 4:15-cv-05110-RBH, 2017 WL 3205798, at *2 n.4 (D.S.C. July 28, 2017). The Court construes the parties' motions as ones for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure.[5] Rule 52(c) provides:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

---

[4]    Defendant argued it was entitled to judgment as a matter of law because the evidence showed Mr. Jackson was maintaining at best a one-second following distance, which was insufficient and not compliant with S.C. Code § 56–5–1930(a) (the following too closely statute). Plaintiff argued the "sudden emergency" doctrine and *Horton v. Greyhound Corp.*, 128 S.E.2d 776 (S.C. 1962), required the Court to rule in her favor as a matter of law. The Court addresses the parties' respective arguments by way of its Findings of Fact and Conclusions of Law below.

[5]    *See generally Carter v. Ball*, 33 F.3d 450, 457 (4th Cir. 1994) ("A district court sitting without a jury may enter judgment as a matter of law against a party on any claim once the party has had a full opportunity to present evidence on that claim. Fed. R. Civ. P. 52(c)."); *M & M Poultry, Inc. v. Pilgrim's Pride Corp.*, 281 F. Supp. 3d 610 (N.D.W. Va. 2017) ("In a bench trial, the proper motion is a judgment on partial findings under Federal Rule of Civil Procedure 52(c) rather than for judgment as a matter of law under Rule 50."); *see, e.g., Cadence Bank, N.A. v. Horry Properties, LLC*, No. 4:10-cv-02717-RBH, 2012 WL 1110089, at *1 n.1 (D.S.C. Apr. 2, 2012) ("A motion for judgment as a matter of law is made under Federal Rule of Civil Procedure 50, which applies in jury trials. The proper motion in a non-jury trial is a Rule 52(c) motion for judgment on partial findings, and the Court will construe Defendants' Motions as such.").

Fed. R. Civ. P. 52(c). "Rule 52(c) expressly authorizes district judges to resolve disputed issues of fact." *M & M Poultry*, 281 F. Supp. 3d 610. Rule 52(c) "requires that a party be 'fully heard' before a judgment is rendered on a particular issue." *First Virginia Banks, Inc. v. BP Expl. & Oil Inc.*, 206 F.3d 404, 407 (4th Cir. 2000) (quoting Fed. R. Civ. P. 52(c)). "Under this Rule, a court assesses the evidence presented and may render judgment if the evidence is insufficient to support a claim or defense." *Ethox Chem., LLC v. Coca-Cola Co.*, No. 6:12-cv-01682-KFM, 2015 WL 12807733, at *2 n.4 (D.S.C. Sept. 30, 2015), *aff'd* 683 F. App'x 958 (Fed. Cir. 2017).

Having studied the evidence, reviewed the parties' arguments, and considered the applicable law, the Court now issues the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). To the extent that any findings of fact constitute conclusions of law, or vice-versa, they shall be so regarded.

## Findings of Fact

### I. Parties

1. Plaintiff Kimberly L. Jackson is a citizen and resident of Dunn, North Carolina (located in Harnett County), and she is the Administratrix of the Estate of Jerry D. Jackson, Jr., her deceased husband. Plaintiff and Mr. Jackson had two sons, Hunter and Cacey. Hunter was sixteen years old and living at home at the time of the accident, and Cacey was emancipated and living in California.

2. Defendant is the United States of America by virtue of the Federal Tort Claims Act and a tort/automobile accident involving Carolyn M. Cole, one of its rural mail carriers.

### II. Underlying Accident

3. At approximately 2:00 P.M. on September 12, 2015, Mr. Jackson and nine other men were

riding their motorcycles in a staggered group formation on U.S. Highway 701 North in Horry County, South Carolina, and were in the process of passing Cannon Glass Service, a business located on the right side of the northbound lane of Highway 701. The group was returning to North Carolina from a planned trip they had taken to Charleston, South Carolina. Mr. Jackson and the nine other motorcyclists all lived in North Carolina and possessed North Carolina driver's licenses with a motorcycle endorsement.

4. Rodney Stewart, Woodrow Hodges Jr., William Strickland, Harry Halstead, and Roy Joffrion were in front of Mr. Jackson; and Keith Honeycutt, Paul Godwin, Patrick Burgess, and Ron McLeod were behind Mr. Jackson. All riders were wearing helmets. The posted speed limit was 55 miles per hour, and the group was traveling between 55 to 60 miles per hour in the northbound lane of Highway 701. It had rained earlier that day, the road was damp, and the air was misty. Some of the riders were wearing raingear.

5. Mr. Jackson was driving a 2004 Harley-Davidson Road King motorcycle, and he was positioned sixth in the staggered group formation. Mr. Jackson was riding beside the fog line (i.e., the solid white line bordering the roadway) directly behind Halstead (who was also riding beside the fog line) and diagonally/staggered behind and to the right of Joffrion (who was riding beside the centerline).

6. On September 12, 2015, Carolyn M. Cole was employed by the United States Postal Service and acting within the scope of her employment and performing her duties as a rural mail carrier while driving her 2006 Saturn Ion sedan. Cole had recently completed the Postal Service's training program, and it was her first day delivering mail by herself. She was driving her car by sitting in the center console area, operating the steering wheel with her left hand, and

8

depressing the accelerator and brake with her left foot. This driving position is the Postal Service's accepted method for rural mail carriers operating left-hand drive vehicles.

7.   Cole was traveling southbound along the shoulder of Highway 701 when she missed a turn on her mail route, so she pulled into the parking lot of Cannon Glass Service to turn around. This portion of Highway 701 is a two-lane roadway that is straight and flat with unobstructed views. Cole turned around in the parking lot and drove toward the upward-sloping driveway apron where the driveway intersected with the northbound lane of Highway 701.

8.   Cole testified she brought her vehicle to a complete stop as she approached the northbound lane of Highway 701. She looked to her left after stopping and not only saw but also heard a group of motorcycles traveling toward her in the northbound lane of Highway 701. Intending to make a right turn onto the shoulder of Highway 701 northbound, Cole looked to her right to determine whether she would be able to navigate around a mailbox located just to the right of the driveway where her car was positioned and Highway 701 northbound. As she prepared to make the right turn around the mailbox and onto the shoulder of the road, she took her foot off the brake and her car, which she described as being on a slight incline, began slowly rolling backwards. She then pressed the accelerator to start moving forward again, and as she did so, she looked back left and noticed the motorcyclists were much closer than before. Given their close proximity to the driveway where her vehicle was located, Cole decided to delay her right turn to let the approaching motorcyclists pass by. However, when she attempted to press her brake with her left foot, her car "jumped" forward and the accident occurred almost instantaneously.

9.   Cole testified her best guess as to what happened was that she went to apply the brake with her foot but her foot slipped off the edge and hit the accelerator. Even though Cole was using a

9

method accepted and approved by her employer, the Postal Service, it appears she was awkwardly having to operate her vehicle with her left foot and left hand after a very limited amount of training and while on the first day of her job, after having missed a turn and attempting to reroute herself.

10. Regardless of the exact reason why, it is clear Cole failed to yield the right of way to the oncoming motorcyclists and failed to maintain proper control of her vehicle, thereby causing her vehicle to enter the roadway accidentally and unintentionally, resulting in the accident.

11. Cole's car collided with the motorcycles that Halstead and Joffrion were riding. Halstead's motorcycle hit Cole's car first, striking the left side front quarter panel of the Saturn Ion and causing the car to spin clockwise and face the complete opposite direction as it came to a resting stop in the northbound lane of Highway 701. Joffrion's motorcycle hit Cole's car second, striking the right side rear quarter panel of the Saturn Ion and causing the car to spin clockwise facing the southern direction but resting in the northbound lane. The witnesses who saw the impact of Halstead's and Joffrion's motorcycles with Cole's car described it as an explosion with parts and pieces flying everywhere, and the collision created a debris field. Halstead and Joffrion were injured as a result of the collision. Their motorcycles and bodies came to a rest in the southbound lane of Highway 701.

12. Based on the evidence presented, as Cole pulled onto Highway 701 North and collided with Halstead and Joffrion, Mr. Jackson attempted to maneuver his motorcycle to the left of Cole's vehicle (which had entered into his lane) and in the process he lost control of his motorcycle, spilled onto the roadway, and sustained fatal injuries. Mr. Jackson's motorcycle came to a rest in a ditch alongside the southbound lane of Highway 701, and his body was located in the

southbound lane. The testimony and evidence, including the report completed by the South Carolina Highway Patrol Multi-Disciplinary Accident Investigation Team ("MAIT"), indicated Mr. Jackson did not make contact or collide with any other motor vehicle.[6] *See* Pl. Ex. 2; Def. Ex. 40.

13.     The remaining four motorcyclists who were behind Mr. Jackson—Honeycutt, Godwin, Burgess, and McLeod—were able to maintain control of their motorcycles, stop safely, and avoid involvement in the incident.

14.     Although negligent, Cole's actions were completely accidental and unintentional.

## III.    The Motorcyclists

15.     By all accounts, this group of motorcyclists appeared to be a responsible, mature, and experienced group of riders who participated in the ride by invitation only. Multiple riders testified that safety was paramount and that they would not tolerate "hotdogging" or "hot-rodding" in their group trips. The group consisted of men from varying vocations, professions, and riding backgrounds:

- Plaintiff worked part-time as an emergency medical technician for Dunn Emergency Services in Harnett County, North Carolina, and he had 60,000 miles on his Harley Davidson going into the trip. Plaintiff was very particular about his motorcycle and maintained it well in every respect.

- Halstead had been riding motorcycles for over forty years, and he is a clinical systems analyst for Harnett Health hospital.

- Joffrion is a mechanic in the Army National Guard and served four tours of duty in Iraq and Afghanistan.

- Hodges was the self-appointed "ride captain" and had been functioning as such

---

[6]     There is one exhibit that states Cole's "vehicle pulled into the roadway causing Mr. Jackson to collide with another motorcycle." Pl. Ex. 86 (Next of Kin Notification). However, no other evidence indicated Mr. Jackson's motorcycle collided with another one, and neither party advanced this position.

for many years before the ride in question. Hodges testified most members of the group had ridden thousands of miles without any one of them ever bumping into the back of another rider.

- Strickland is a certified master technician for Harley Davidson, works as a mechanic at Motorcycle Madness in Dunn, North Carolina, and regularly serviced the motorcycles for seven of the ten riders, including Plaintiff.

- Godwin is a thirty-five year veteran of the United States Army and retired as an E-9 Command Sergeant Major.

- Burgess is an E-8 Master Sergeant in the Army and was Joffrion's platoon sergeant.

- McLeod (who was riding a trike in the very back of the group) was in his seventies, had been riding motorcycles since he was a teenager, and had participated in numerous prior group rides throughout the United States.

- The other two riders, Rodney Stewart and Keith Honeycutt, did not testify.

16.     The ride itself was an invitation-only event to remember the September 11, 2001 tragedy. The Court heard live testimony from McLeod, Burgess, Godwin, Strickland, Joffrion, and Halstead, all of whom were riding with Mr. Jackson at the time of the accident. The Court had the opportunity to hear and observe the riders who testified, except for Hodges who testified by written deposition.

## IV.     Defendant's Expert Witness Testimony

17.     Defendant presented two experts in support of its position that Mr. Jackson was negligent and could have avoided the accident. While the Court agrees with some of the general principles raised by these experts, the Court again finds that degree of Cole's negligence far outweighed that slight degree of Mr. Jackson's negligence. However, because some slight degree of negligence is attributable to Mr. Jackson, some discussion is necessary regarding the evidence supporting that finding.

18. Defendant offered testimony from Erin Higinbotham, an expert in mechanical engineering with qualifications in accident reconstruction and motorcycle operations, and Kendrick Richardson, an expert in mechanical engineering with qualifications in accident reconstruction and vehicle dynamics. Higinbotham and Richardson based their expert opinions in part on several publications that provide the industry standards for safe motorcycle operation while riding in a group. These publications include:

A. **The South Carolina Department of Motor Vehicles Drivers Handbook**, which indicates:

- The proper formation for group motorcycle riding is a staggered pattern. When traveling in a group in the staggered formation, each cyclist should be careful to maintain the proper following distance at all times. Riding in a staggered formation is the best way to keep ranks close and yet maintain an adequate space cushion. In a staggered formation, the leader rides to the left side of the lane, while the second rider stays a little behind and rides to the right side of the lane. A third rider would take the left position. The fourth rider would be in a normal position behind the second rider. This formation keeps the group close and keeps each rider a safe distance from others ahead, behind, and to the sides. *See* Def. Ex. 55 at p. 144–45.
- On slippery surfaces, a motorcycle needs more distance to stop. *See id.* at p. 148.
- Laws that apply to all other motor vehicle operations apply to motorcycle operations. *See id.* at p. 152.
- Motor vehicles following another vehicle should use a minimum of a three to four second following interval, and if any unusual condition exists such as rainy weather, an additional second should be added.[7] *See id.* at p. 85.

---

[7] The Court notes the South Carolina Department of Motor Vehicles Drivers Handbook recommends an equal or greater following distance (3-4 seconds in normal conditions and an additional second in unusual conditions such as rainy weather) than the Motorcycle Safety Foundation Operator Manual/related Riding Tips document (which recommend 3-4 seconds at speeds above 40 miles per hour) and the North Carolina Motorcyclists' Handbook (which recommends 2 seconds in normal conditions and 3 seconds or more with slippery pavement conditions). This recommendation in the South Carolina Handbook is found in the section entitled "Following Other Cars" and under the subheading of "Cars." As indicated above, the South Carolina Handbook states that when motorcyclists are riding as a group in a staggered formation, "each cyclist should be careful to maintain **the proper following distance** at all times." *See* p. 144 (emphasis added). And, as the South Carolina Handbook states on page 151, motorcyclists are subject to the same duties as drivers of motor vehicles. *See* S.C. Code Ann. § 56–5–3610.

B.  **The Motorcycle Safety Foundation[8] Motorcycle Operator Manual and related Riding Tips document**, which indicates:

- A staggered formation is the best way to keep the ranks close yet maintain an adequate space cushion. The group leader rides in the left side of the lane, and the second rider stays at least one second back and rides in the right side of the lane. The third rider maintains the left position of the lane, at least two seconds behind the first rider. The fourth rider should keep at least a two-second distance from the second rider in the right side of the lane, and so on. This formation keeps the group close and permits each rider to maintain a safe distance from others ahead, behind, and to the sides. *See* Def. Ex. 57 at p. 39.
- Following too closely is a factor in crashes involving motorcycles. In traffic, motorcycles need as much distance to stop as cars. Normally, a minimum of two seconds distance should be maintained behind the vehicle ahead. A two-second following distance leaves a minimum amount of space to stop or swerve if the driver ahead stops suddenly. A larger cushion of space is needed if a rider's motorcycle will take longer than normal to stop. If the pavement is slippery, a rider should open up a three-second or more following distance. *See id.* p. 16.
- When a motorcyclist is riding in town at speeds under forty miles per hour, he should always keep a two-second gap between him and the car in front. For example, when he rides by a phone pole, he should count "one-thousand-one, one-thousand-two" and then should pass that pole. Out on the open road with higher speeds, a motorcyclist should adjust his gap to three or four seconds or more, depending on his speed, and should use the same reference-point technique to determine how many seconds behind he is. *See* Def. Ex. 58 at p. 29.

C.  **The North Carolina Department of Transportation – Division of Motor Vehicles Motorcyclists' Handbook**, which indicates:
- Group riding in a staggered formation is the best way to keep ranks close yet maintain an adequate space cushion. The leader rides in the left side of the lane, while the second rider stays one second behind in the right side of the lane. A third rider maintains in the left position, two seconds behind the first rider. The fourth rider would keep a two-second distance behind the second rider, and so on. This formation keeps the group close and permits each rider a safe distance from others ahead, behind, and to the sides. *See* pp. 36–37.
- Following too closely could be a factor in crashes involving motorcyclists. In traffic, motorcycles need as much distance to stop as cars. Normally, a minimum of two seconds distance should be maintained behind the vehicle

---

[8]  The Motorcycle Safety Foundation is the nationally recognized developer of the comprehensive research-based rider education and training system for the accepted standard of care owed by motorcycle riders for safe motorcycle operations.

ahead. A two-second following distance leaves a minimum amount of space to stop or swerve if the driver ahead stops suddenly. A larger cushion of space is needed if a rider's motorcycle will take longer than normal to stop. If the pavement is slippery, a rider should open up a three-second or more following distance. *See* pp. 15–16.

19. All testimony indicated the motorcyclists were traveling approximately 55 miles per hour at the time of the accident, and Higinbotham and Richardson both testified that a motorcycle traveling at 55 miles per hour covers 80.7 feet per second. Thus, at 55 miles per hour, a motorcycle would travel approximately 161 feet in two seconds and approximately 242 feet in three seconds. Consequently—as indicated by Higinbotham's and Richardson's testimony and expert reports—a one-second following distance would be 80.7 feet between motorcycles; a two-second following distance would be approximately 161 feet between motorcycles; and a three-second following distance would be approximately 242 feet between motorcycles.[9] Both Higinbotham and Richardson opined that three seconds was the proper following distance for a motorcycle traveling 55 miles per hour on a wet road.

20. The Court notes that some witnesses testified in terms of bike (i.e., motorcycle) and car lengths, while others testified in terms of feet. The average length of a motorcycle is eight feet, according to Richardson's and Higinbotham's testimony and expert reports. Most of the motorcyclists indicated they were at least two to three bike lengths from the diagonal/staggered position bike, to anywhere from four to six to eight bike lengths from the motorcycle directly in front. Under any calculation, it is clear Mr. Jackson was no more than one second from Halstead's motorcycle that was directly in front of Mr. Jackson; in other words, Mr. Jackson

---

[9] These following distances are for the motorcycles directly in front of one another, not the ones diagonally staggered apart from one another.

was maintaining at best a one-second following distance from Halstead, not the appropriate three-second following distance suggested by Defendant's experts. Furthermore, the evidence indicates Mr. Jackson had ahead of him the visual cues of Strickland and Halstead taking evasive maneuvers as Cole's vehicle entered the roadway. Mr. Jackson attempted to maneuver his motorcycle to the left of Cole's vehicle (which had entered into his lane), but he lost control of his motorcycle, spilled onto the roadway, and sustained fatal injuries.

21. Based on Higinbotham's testimony and expert opinions, both the group's and Mr. Jackson's following distances were too short, and Mr. Jackson's inadequate following distance hindered his ability to safely operate his motorcycle to avoid the accident and was a cause of his crash.

22. Likewise, based on Richardson's testimony and expert opinions, Mr. Jackson failed to maintain an appropriate following distance, and his failure to do so was a cause of his crash.

## V. Plaintiff's Expert Witness Testimony

23. Plaintiff's expert Alan Campbell (with expertise in civil engineering and human factors) testified about principles relating to perception-reaction time and explained why Mr. Jackson was unable to process the stimuli of (a) Strickland veering to the left as Cole began to pull out the driveway or (b) Halstead moving to the left just before coming into contact with Cole's vehicle. Campbell testified Mr. Jackson was overwhelmed by the debris from the motorcycles and automobile, which prevented him from safely maintaining control of his motorcycle.

24. Although Campbell testified Mr. Jackson had very little reaction time to avoid the accident and was placed in a "sudden emergency," the Court disagrees with Campbell's opinion that following distance and spacing between motorcycles had nothing to do with this accident. If Mr. Jackson had been maintaining an adequate following distance, he would have potentially

had adequate time to safely slow down, stop, or turn his motorcycle without losing control once he had the visual cues that Strickland and Halstead were taking evasive maneuvers as Cole's vehicle entered the roadway.

**VI.    Degrees of Fault/Negligence Attributable to Cole and Mr. Jackson**

25.    The overwhelming weight of the evidence is that Cole, a postal employee on her first day following her mail route by herself, failed to maintain control of her vehicle and drove onto the northbound lane of Highway 701 into the path of the group of motorcyclists and failed to yield the right-of-way to the oncoming motorcyclists, including Mr. Jackson.  Cole's negligence far outweighed any negligence of Mr. Jackson, who was operating his motorcycle in a staggered formation with nine other riders.  Cole testified that she was responsible for the accident, that the accident would not have happened if her vehicle had not moved into the road, and that Mr. Jackson's death was the result of the accident she caused.

26.    However, based on the evidence received, the Court believes there was some slight degree of comparative negligence involved on the part of Mr. Jackson.  This is supported by the Court's findings that the road was somewhat damp (which is corroborated by the fact that several riders were wearing raingear, the dashcam video from Cpl. Costa's patrol car shows rain droplets on the windshield, and photographs of the accident scene indicate moisture on the road); that both Plaintiff and Defendant took the position that no collision or contact occurred between Mr. Jackson and another rider; that Mr. Jackson appeared to be able to enter the southbound lane; and that based on Defendant's experts' opinions and the industry standards for safe motorcycle operation, Mr. Jackson did not have adequate following distance despite visual cues to alert him. The Court recognizes the "Monday-morning quarterbacking" and analysis of the causation

experts who testified for Plaintiff and Defendant about the dynamics of the accident and general standards for safe operation of motorcycles. The handbooks at issue are not law, but they do provide some evidence of the standard of care of safe motorcycle riding in a staggered group formation. All emphasize safe following distances in terms of time (i.e., seconds). Defendant argues, and their experts testify, that reasonably safe following distances should have been maintained between the motorcycles based on their speed and time (i.e., seconds) between the motorcycles. While Plaintiff argued the motorcyclists stayed together so that no cars could cut into the group, Plaintiff pointed to no law allowing motorcyclists to disregard reasonably safe following distances and to caravan so close together such that there was not a safe distance between one another.[10] Based on Higinbotham's and Richardson's expert opinions, Mr. Jackson was at best maintaining a one-second following distance from Halstead, who was directly in front of him. Because Mr. Jackson was following Halstead too closely, Mr. Jackson was obviously following Joffrion too closely (as Joffrion was staggered diagonally ahead of Mr. Jackson to his left). Higinbotham and Richardson opine Mr. Jackson should have been maintaining a three-second following distance from Halstead, as recommended by the publications summarized above. Even a two-second following distance (as contemplated by some of the publications) would have provided an extra second and given Mr. Jackson an additional eighty feet of stopping distance.

27. Plaintiff has met her burden of proof by a preponderance of the evidence, and the Court finds

---

[10]    Although Plaintiff argued the motorcyclists stayed together so that no cars could cut into the group, the following-too-closely statute provides that "[m]otor vehicles being operated upon any roadway outside of a business or residence district in a caravan or motorcade whether or not towing other vehicles shall be so operated as to allow sufficient space between each such vehicle or combination of vehicles so as to enable any other vehicle to enter and occupy such space without danger." S.C. Code Ann. § 56–5–1930(C). Interestingly, neither Plaintiff nor Defendant has cited subsection (C) of this statute or attempted to explain its application to this case.

Defendant's negligence was far greater than Mr. Jackson's. Likewise, Defendant has met its burden of proof by a preponderance of the evidence that Mr. Jackson was comparatively negligent to a slight degree. Specifically, the Court finds Defendant's percentage of negligence or fault was 90% while Mr. Jackson's percentage of negligence or fault was only 10%.

## VII. Damages

28. Mr. Jackson was born on August 23, 1966, and was forty-nine years old at the time of his death. His life expectancy was 30.07 years in accordance with the life expectancy tables found in S.C. Code Ann. § 19–1–150.

### A. Pecuniary Loss

#### 1. Lost Earning Capacity

29. Mr. Jackson was employed by Dunn Emergency Services, Inc. ("DES") as an emergency medical technician ("EMT") at the time of his death. He was employed on a part-time basis with a base pay rate of $10.00 per hour. Mr. Jackson was certified as an emergency medical technician, paramedic, Fire Fighter I and II and also functioned as the captain of DES's EMS volunteer services. He wanted to become eligible for full-time employment with DES as a shift medic, a position he was striving to attain by January 1, 2016. As a full-time shift medic with DES, Mr. Jackson would have had a starting annual salary of $48,000 and would have been eligible for various employment benefits. However, he was not eligible at the time of his death due to the fact that he had not been credentialed or cleared to do so by the Medical Director of Harnett County, North Carolina (who at the time was Dr. Mark Glaser).

30. Plaintiff testified Mr. Jackson was probably going to seek a job in another county if he was unable to move forward at DES as a full-time paramedic, but that he had not done anything prior

to his death on September 12, 2015, to apply for or formally seek employment in another county, or to obtain any documentation about other job opportunities.

31.   Plaintiff testified that at the time of Mr. Jackson's death on September 12, 2015, he was set on only working for DES and passing the DES credentialing requirements.

32.   Plaintiff testified that as of September 12, 2015, Mr. Jackson had not applied for a job as an EMT-Paramedic for any other county in North Carolina, had no job application forms, had no documentation indicating any other counties in North Carolina had EMT-Paramedic job openings, and had no job offers to begin any employment on January 1, 2016.

33.   Plaintiff testified that she is unaware of any documentation that would identify any full-time EMT-Paramedic position in any county of North Carolina and the starting salary/benefits package that Mr. Jackson would have been eligible to receive, if hired.

34.   Plaintiff testified Mr. Jackson enjoyed his job at DES, enjoyed being close to home working in the community where he grew up and lived in, and would take any chance he got to be at the Dunn Station working with the team.

35.   Dr. Mark Glaser, the former Medical Director of Harnett County, testified that all individuals that enter the Harnett County EMS system as an EMT-Paramedic must meet certain privileging or credentialing criteria by the Medical Director before being cleared and accepted to function, and that Mr. Jackson had not been cleared or accepted by him.

36.   Dr. Glaser testified that he was unaware of any medical issues preventing Mr. Jackson from obtaining his clearance to meet the privileging criteria to function as an EMT-Paramedic, but that Mr. Jackson had failed the Harnett County EMS System Interview/Oral Board Evaluation on three separate occasions between September 3, 2014, and February 25, 2015, which

prevented his clearance.

37.  Dr. Glaser testified that Mr. Jackson was not eligible to reenter and participate in the preceptor program towards earning his clearance until August 2015, and that at the time of his death, Mr. Jackson was not enrolled in the program. Dr. Glaser further testified the letter dated September 16, 2015, and signed by him (*see* Def. Ex. 30) was simply a posthumous honor/tribute to Mr. Jackson and his family and did not actually mean Mr. Jackson had successfully completed the requirements to function as an EMT-Paramedic in Harnett County.

38.  At the time of his death, Mr. Jackson had not been credentialed or cleared by the Medical Director of Harnett County, North Carolina to function as a full-time EMT-Paramedic.

39.  Dr. Oliver Wood, Jr., who was Plaintiff's economic loss expert, prepared a preliminary appraisal and a revised appraisal assessing the financial loss to Mr. Jackson's beneficiaries.

40.  Dr. Wood's testimony was based in part on the letter of Gary Whitman, who did not testify. Gary Whitman was the Chief of DES who advised that if Mr. Jackson was hired as a full time paramedic with DES, then his salary would have been $48,000 per year.

41.  Dr. Wood testified that Dr. Glaser's September 16, 2015 letter was a tribute letter and that Dr. Glaser did not intend for it to be used to quantify any potential income loss.

42.  Plaintiff argued that even if Mr. Jackson was not credentialed to work full-time for DES, then he would have secured other employment in another county making $48,000. This is too speculative and not reliable for multiple reasons. There is no reliable evidence indicating Mr. Jackson had ever applied for or been offered such a position in another county, and there is no reliable evidence of what the pay was in another county.

43.  Because the evidence of Mr. Jackson's lost earning capacity is too speculative and not

sufficiently reliable, the Court finds Plaintiff is not entitled to a damages award for same.[11] However, as explained below, the Court does find Dr. Wood's opinion regarding the value of lost family/household services is sufficiently reliable.

## 2. Loss in Family Services

44. Plaintiff testified about Mr. Jackson's contributions to their household, explaining he handled most of the yard work around the house, was a very good cook and regularly cooked for the family, and cleaned the house. She characterized Mr. Jackson as having a strong work ethic. Similarly, Jerri McLamb, Plaintiff's sister-in-law, testified Mr. Jackson took care of everything around the house, such as the vehicles, the yard, and other tasks.

45. There was reliable evidence presented that Mr. Jackson contributed to household services, which requires a calculation of monetary loss to his beneficiaries.

46. Based on information provided to him by Plaintiff, Dr. Wood determined that Mr. Jackson contributed an average of thirteen hours per week to family/household services and that a compensation rate of $9.00 per hour was appropriate. Based on the thirteen-hour figure and $9.00 pay rate, Dr. Wood calculated "Before-Trial Loss in Family Services" to be $14,274 and the "After-Trial Loss in Family Services" to be $106,115.

47. The Court finds Dr. Wood's opinion regarding the value of lost family/household services is sufficiently reliable, and therefore Plaintiff is entitled to an award of damages for loss in family services in the amount of $120,389.

_____

[11] The only opinion testimony offered by Dr. Wood regarding the income loss was based solely on a salary of $48,000. No other computations were made or offered as to income. The Court notes Plaintiff did not obtain an opinion from Dr. Wood regarding Mr. Jackson's lost earning capacity based on his actual yearly salary of $7,360 as a part-time EMT-Basic employee. That may be because Mr. Jackson's total personal consumption (nearly $250,000, according to Dr. Wood's figures) would have negated such a calculation.

### B. Non-Pecuniary Loss

48. Mr. Jackson was married to Plaintiff, who was born on July 29, 1968, and was forty-seven years old at the time of her husband's death. Mr. Jackson and Plaintiff were married for twenty-five years in a loving relationship and had two sons: Cacey, who was born on December 4, 1990, and was twenty-four years old at the time of his father's death, and Hunter, who was born on January 8, 1999, and was sixteen years old at the time.

49. Plaintiff testified in great detail about the marriage bond she shared with her husband and the void his death has left in her life as well as her sons'. She spent the early portion of her testimony at trial providing commentary on numerous photographs of her and her husband that were incorporated into a video montage shown at her husband's funeral. She testified to their mutual love for travel and how Mr. Jackson and she would routinely take trips together on their anniversary. She also described frequent trips they would take together on their motorcycle.

50. Plaintiff testified about the feeling of shock that set in when she first learned of her husband's death. The primary way she tried to manage her grief after learning of her husband's death was through the counsel of friends and family, which she continues to do as the need arises. She testified she is simply unable to afford the recommendations of Dr. Raley to be treated regularly by psychiatrists and psychologists. Plaintiff spends most of her days now trying to keep herself busy so as not to dwell on her husband's death, though she still experiences emotional breakdowns from time to time. She frequently worries about her younger son, Hunter, and the impact his father's death has had on him with it having occurred at such a formative time in his life.

51. Hunter Jackson testified he is currently nineteen years old and was sixteen at the time of his

father's death.  Hunter described being so worried about his mother during the months following his father's death that he decided to get her a puppy in hopes that it might help her manage her grief.  Hunter saw a grief counselor several times following his father's death.  Hunter, who is now of college age, used to have periodic conversations with his father about the course his life might take once he finished high school.  Hunter had planned on possibly joining the military but did not want to leave home or his mother.  Hunter works at a car dealership and still lives at home with his mother.

52.  Dr. Jesse A. Raley, M.D. is a forensic, child and adolescent, and adult psychiatrist who performed a forensic psychiatric evaluation on both Plaintiff and Hunter on April 19, 2017, to assess the impact of Mr. Jackson's death on their respective lives.  Dr. Raley explained how traumatic and unexpected deaths fundamentally differ from natural, expected deaths, and consequently, tend to impact survivors in far more significant ways.  He described the mental health impact on both Plaintiff and Hunter.  Plaintiff had anxiety issues and multiple panic attacks before returning to work, and she had suicidal thoughts but knew it was against her religion.  Both Plaintiff and Hunter had suffered from insomnia, mental anguish, shock, emotional loss, and a loss of companionship.  Hunter was impacted during a transition time in his life because he was finishing high school and progressing into adulthood.

53.  Cacey Jackson testified he joined the United State Marine Corps immediately after high school and served for five years before being honorably discharged.  He was twenty-seven years old at the time of trial and lives in California.  He characterized his father as a "tough love" parent but said they would talk by phone once a week on average.  Regrettably, the last time Cacey saw his father before his death was during Christmastime 2013.  Cacey said he was in the early

stages of planning his trip home for Christmas 2015 when he received the news of his father's untimely death. Cacey first learned of his father's death on the day it happened through a chance phone call with his grandfather (Mr. Jackson's father). Cacey described his grandfather as initially being rather sullen with him during the call, before it soon dawned on him that he has unaware his father had passed away. When Cacey, who was alone in his apartment at the time, received this news from his grandfather, it shocked and devastated him. He immediately called his mother and returned home to North Carolina days after receiving the news of his father's death and remained there for almost a month. Cacey still struggles emotionally with his father's death.

54. Jerri McLamb, Plaintiff's sister-in-law, testified regarding Plaintiff's mental shock and grief. McLamb testified Plaintiff struggled to sleep during the days and weeks following the accident. McLamb also described Mr. Jackson's funeral and how other first responder departments in the Dunn area lined the procession route and stood at attention when Mr. Jackson's body passed by to be buried. She remembered how Mr. Jackson's body was transported to his grave site not in a traditional hearse but in an ambulance instead. Moreover, McLamb testified about her observations regarding how Hunter seemed to hold himself together for a while following his father's death but eventually began withdrawing, shutting people out, and not sleeping, eating, or leaving his room. She remembered how Hunter had a difficult time re-engaging in school.

55. Jessica Williams, a close friend of the Jacksons, testified she and her husband developed a close friendship with the Jacksons primarily through motorcycle riding, and the couples took several trips together over the years. Williams explained how Mr. Jackson would frequently express his love for Plaintiff by leaving her handwritten love notes around the house and before going

out of town on trips.[12]  Williams described Mr. Jackson not only as Plaintiff's "rock" but also as the bond who held everyone together and kept everyone laughing.

56.     Dewayne Stancil, a longtime friend of the Jacksons, testified he knew Mr. Jackson for about thirty-five years.  Stancil testified about the shock that Mr. Jackson's death caused Plaintiff and her sons, particularly Hunter.  Stancil described Mr. Jackson as completely devoted to his family, and characterized Plaintiff as having a broken heart.  According to Stancil, Plaintiff lost her best friend when Mr. Jackson died.  Regarding Hunter, Stancil testified he believes Hunter is trying to be the man of the house and ensure his mother is doing okay, which is tough on Hunter.  Stancil perceived Hunter as being withdrawn (frequently in his room with the door shut not wanting to socialize with others), seeking to be alone, and in a lot of emotional pain during the months following his father's death.

57.     Patrick Burgess, one of the motorcycle riders on the day of the accident and a longtime friend of the Jacksons, testified he attended high school with Plaintiff.  Burgess described some of his interactions with Plaintiff since the time of the accident and characterized her as seeming depressed.  Burgess also described how he was one of the persons responsible for creating a cross to be placed at the scene of the accident as a memorial to Mr. Jackson.  The memorial was created several weeks after the accident, and Burgess described how upwards of twenty friends of the Jacksons (in addition to Plaintiff and Hunter) attended the memorial service.

58.     Harry Halstead, one of the motorcycle riders on the day of the accident and a good friend of Mr. Jackson's, testified how moving Mr. Jackson's funeral was.

59.     The Court finds that based upon a preponderance of the evidence, Plaintiff and the statutory

---

[12]     In fact, Mr. Jackson held true to this habit before leaving town on the trip which took his life.

beneficiaries have suffered non-pecuniary damages based upon their mental shock and suffering, wounded feelings, grief and sorrow, loss of Mr. Jackson's companionship, and deprivation of the use and comfort of his society. While it is always difficult to assign a monetary value for these damages, after thoughtful deliberation, the Court values this non-pecuniary loss at four million dollars ($4,000,000).

**C.     Funeral Expenses**

60.     Plaintiff submitted a funeral bill from Rose and Graham Funeral Home located in Benson, North Carolina, specifying the burial services for Mr. Jackson totaled $11,527.08.

## Conclusions of Law

**I.     Jurisdiction, Venue & Applicable Law**

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1346.

2.     Pursuant to 28 U.S.C. § 1391(b)(2) and Local Civil Rule 3.01(A)(1) (D.S.C.), venue is proper in this Court because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Florence Division of the United States District Court for the District of South Carolina.

3.     The United States is the proper defendant in this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671–2680. Carolyn Cole was operating a motor vehicle within the course and scope of her federal employment with the United States Postal Service at the time of the accident on September 12, 2015. *See* 28 U.S.C. § 2679(b)(1). Plaintiff filed her complaint on September 26, 2016, and has satisfied the administrative requirements of the

FTCA.[13]

4.  The FTCA imposes tort liability on the United States only "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, and only to the extent that "a private person[ ] would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.* § 1346(b)(1). The FTCA is a limited waiver of sovereign immunity, and therefore courts must strictly interpret and apply it. *United States v. Sherwood*, 312 U.S. 584, 590 (1941); *Gould v. U.S. Dep't of Health & Human Servs.*, 905 F.2d 738, 741 (4th Cir. 1990).

5.  Under the FTCA, procedural matters are governed by federal law; however, the FTCA directs courts to examine substantive legal issues pursuant to the laws of the place where the act or omission occurred. *Miller v. United States*, 932 F.2d 301, 303 (4th Cir.1991) ("A plaintiff has an FTCA cause of action against the government only if she would also have a cause of action under state law against a private person in like circumstances. State law determines whether there is an underlying cause of action . . . ."); *Dunbar Corp. v. Lindsey*, 905 F.2d 754, 757 (4th Cir.1990) ("United States liability under the FTCA depends upon state law."). Here, Plaintiff alleges Cole acted negligently while driving in Horry County, South Carolina. Therefore, South Carolina law, including that regarding negligence and wrongful death actions, controls. *See* 28 U.S.C. § 1346(b)(1).

## II. Wrongful Death Actions

6.  The South Carolina Wrongful Death Act provides in pertinent part that "[w]henever the death

---

[13]  Before filing this action, Plaintiff filed an administrative claim with the United States Postal Service as required by 28 U.S.C. § 2675(a), and the Postal Service denied the claim. *See* Complaint at ¶¶ 6–7.

of a person shall be caused by the wrongful act, neglect or default of another and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, the person who would have been liable, if death had not ensued, shall be liable to an action for damages." S.C. Code Ann. § 15–51–10. "A wrongful death action may be brought by the estate for the benefit of the decedent's heirs." *Estate of Stokes ex rel. Spell v. Pee Dee Family Physicians, L.L.P.*, 699 S.E.2d 143, 145 (S.C. 2010) (citing S.C. Code Ann. § 15–51–20).

### III. Negligence

7.  "Negligence is the failure to use due care, i.e., that degree of care which a person of ordinary prudence and reason would exercise under the same circumstances." *Berberich v. Jack*, 709 S.E.2d 607, 612 (S.C. 2011) (alteration and internal quotation marks omitted). The Court is mindful that negligence law speaks in terms of the "reasonable" person, not the "perfect" person. *Cf. Blount v. McCrory Const. Co.*,176 S.E.2d 407, 410 (S.C. 1970) ("The law recognizes that the person of ordinary reason and prudence . . . is not perfect or infallible.").

8.  "Questions of negligence . . . are ordinarily questions of fact involving the application of the rule of the reasonably prudent man to the facts of the case, and they are not to be decided by applying 'rules of thumb' to the evidentiary facts and treating as conclusions of law what are in reality conclusions of fact." *McClure v. Price*, 300 F.2d 538, 543–44 (4th Cir. 1962) (applying South Carolina law).

9.  "A determination of negligence, standing alone, is a far cry from a determination of liability. Liability encompasses all elements of a negligence claim, including damages proximately caused by the alleged negligence." *Hinds v. Elms*, 595 S.E.2d 855, 857 (S.C. Ct. App. 2004).

10.    To prove a negligence claim under South Carolina law, a plaintiff must show: (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty by a negligent act or omission; (3) the defendant's breach was the actual and proximate cause of the plaintiff's injury; and (4) the plaintiff suffered injury or damages. *Roddey v. Wal-Mart Stores E., LP*, 784 S.E.2d 670, 675 (S.C. 2016).

11.    "Negligence per se is established by showing a statute created a duty to the plaintiff and the defendant breached that duty by violating the statute." *Seals by Causey v. Winburn*, 314 S.C. 416, 418, 445 S.E.2d 94, 96 (Ct. App. 1994). "In order to show that the defendant owes him a duty of care arising from a statute, the plaintiff must show two things: (1) that the essential purpose of the statute is to protect from the kind of harm the plaintiff has suffered; and (2) that he is a member of the class of persons the statute is intended to protect. If the plaintiff makes this showing, he has proven the first element of a claim for negligence: viz., that the defendant owes him a duty of care. If he then shows that the defendant violated the statute, he has proven the second element of a negligence cause of action: viz., that the defendant, by act or omission, failed to exercise due care. This constitutes proof of negligence *per se*." *Whitlaw v. Kroger Co.*, 410 S.E.2d 251, 252 (S.C. 1991). "It has been firmly established by the Supreme Court of South Carolina that the violation of applicable statutes governing the operation of motor vehicles upon the highway . . . is negligence per se, and whether such breach constitutes a proximate cause of the injury complained of is ordinarily a question for the [factfinder]." *Grooms v. Minute-Maid*, 267 F.2d 541, 546 (4th Cir. 1959).

12.    South Carolina follows the doctrine of modified comparative negligence,[14] meaning "a plaintiff

in a negligence action may recover damages if his or her negligence is not greater than that of

the defendant.  The amount of the plaintiff's recovery shall be reduced in proportion to the

amount of his or her negligence." *Nelson v. Concrete Supply Co.*, 399 S.E.2d 783, 784 (S.C.

1991); *see also Berberich v. Jack*, 709 S.E.2d 607, 611 (S.C. 2011).  "Comparative

negligence . . . allows a plaintiff to recover damages not attributable to her own fault

notwithstanding the plaintiff's contribution to the injury." *Smith v. Tiffany*, 799 S.E.2d 479, 489

(S.C. 2017).  Comparative negligence is an affirmative defense, and the defendant bears the

burden to prove it by a preponderance of the evidence.  *Ross v. Paddy*, 532 S.E.2d 612, 616–17

(S.C. Ct. App. 2000).  "Ordinarily, comparison of the plaintiff's negligence with that of the

defendant is a question of fact for the [factfinder] to decide.  In a comparative negligence case,

the trial court should only determine judgment as a matter of law if the sole reasonable inference

which may be drawn from the evidence is that the plaintiff's negligence exceeded fifty percent."

*Bloom v. Ravoira*, 529 S.E.2d 710, 713 (S.C. 2000) (internal citations omitted).

13.    "An essential element in a cause of action for negligence is the existence of a legal duty of care

owed by the defendant to the plaintiff." *Thomasko v. Poole*, 561 S.E.2d 597, 599 (S.C. 2002).

"In a negligence action, the court must determine, as a matter of law, whether the defendant

owed a duty of care to the plaintiff."  *Huggins v. Citibank, N.A.*, 585 S.E.2d 275, 276 (S.C.

2003).  Cole and Mr. Jackson, as motorists, owed certain duties under South Carolina law.

There are various statutory and common law duties relevant to the facts of this case.

---

[14]    Comparative negligence is also known as comparative fault.  *See generally Davenport v. Cotton Hope
Plantation Horizontal Prop. Regime*, 333 S.C. 71 (S.C. 1998) (using the phrases "comparative negligence" and
"comparative fault" interchangeably).

A.    **Common Law Duties**

(1)    "[T]here is imposed upon those using the highways the duty to exercise ordinary care and prudence to avoid injury to themselves and others." *Epps v. S.C. State Highway Dep't*, 39 S.E.2d 198, 201 (S.C. 1946).

(2)    A motorist "traveling upon a favored roadway and ha[ving] the right of way . . . [i]s entitled to assume a stopped vehicle entering the highway from a private drive or parking lot w[ill] wait to cross or enter the highway until it [i]s safe to do so." *Blanding v. Hammell*, 228 S.E.2d 271, 273 (S.C. 1976).

(3)    A motorist "has a duty to keep the automobile under proper control so that the driver is able to slow down, stop, or turn the automobile to avoid colliding with other vehicles, pedestrians, and objects lawfully on the road." *Johnson v. Horry Cty. Solid Waste Auth.*, 698 S.E.2d 835, 840 (S.C. Ct. App. 2010); *see Yaun v. Baldridge*, 134 S.E.2d 248, 251 (S.C. 1964).

(4)    Motorists "have a duty to keep a reasonable lookout to avoid hazards on the highway." *Thomasko*, 561 S.E.2d at 599. "That duty is not merely one of looking, but one of seeing." *Johnson*, 698 S.E.2d at 841. "Having the right of way does not excuse an individual from the common law duty to keep a reasonable lookout to avoid hazards." *Thomasko*, 561 S.E.2d at 599.

(5)    "[A] person using the public roadways of this state owe[s] a duty to exercise ordinary care at all time to avoid an accident." *Johnson*, 698 S.E.2d at 841.

(6)    "A motorist entering a highway must look for traffic thereon in such a manner that the purpose of looking is accomplished, and he is under a duty to see what

32

is in plain sight, unless some reasonable excuse for not seeing is shown." *Williams v. Davis*, 134 S.E.2d 760, 763 (S.C. 1964).

B. **Statutory Duties**

(1)    "The driver of a vehicle about to enter or cross a roadway from any place other than another roadway shall yield the right-of-way to all vehicles approaching on the roadway to be entered or crossed." S.C. Code Ann. § 56–5–2350.

(2)    "The operator of a motor vehicle[15] shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." S.C. Code Ann. § 56–5–1930(A); *see McCowan v. Southerland*, 168 S.E.2d 573, 574 (S.C. 1969) (interpreting the predecessor to § 56–5–1930(A) and explaining "[t]he proper distance to be maintained in all cases between a following vehicle and the one ahead cannot be determined by any mathematical formula" because "[t]he question of whether due care was exercised is controlled by the circumstances of the particular case").

(3)    "A person shall not drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing. Speed must be so controlled to avoid colliding with a person, vehicle, or other conveyance on or entering the highway in compliance with legal requirements and the duty of a person to use

---

[15]    "Every person operating a motorcycle shall be granted all of the rights and shall be subject to all of the duties applicable to the drivers of motor vehicles, except as to special regulations or other provisions of law which by their nature would not apply." S.C. Code Ann. § 56–5–3610.

care. . . .  The driver of a vehicle shall drive . . . at an appropriate reduced speed . . . when special hazard exists . . by reason of weather or highway conditions."  S.C. Code Ann. § 56-5-1520(A), (F).

14. A motorist is "under no duty to anticipate negligent or willful acts or omissions on the part of" another driver. *Kennedy v. Carter*, 153 S.E.2d 312, 317 (S.C. 1967).

15. "[N]egligence is based upon a breach of a duty owed.  A breach of duty exists when it is foreseeable that one's conduct may likely injure the person to whom the duty is owed." *Horne v. Beason*, 331 S.E.2d 342, 344 (S.C. 1985).

16. "Negligence is not actionable unless it is a proximate cause of the injury.  Proximate cause requires proof of both causation in fact and legal cause.  Causation in fact is proved by establishing the injury would not have occurred 'but for' the defendant's negligence.  Legal cause is proved by establishing foreseeability.  Foreseeability is determined by looking to the natural and probable consequences of the complained of act.  The defendant's negligence does not have to be the sole proximate cause of the plaintiff[']s injury; instead, the plaintiff must prove the defendant's negligence was at least one of the proximate causes of the injury." *Bishop v. S.C. Dep't of Mental Health*, 502 S.E.2d 78, 83 (S.C. 1998) (internal citations omitted). "Only when the evidence is susceptible of only one inference does proximate cause become a matter of law for the court." *Id.*

17. The Court finds Plaintiff has proven by a preponderance of the evidence that Cole was negligent, that her negligence proximately caused Mr. Jackson's fatal injuries, and that Cole's negligence far outweighed Mr. Jackson's negligence.  ***First***, under the common law and statutory duties summarized above, Cole had a duty to keep a reasonable lookout to see Mr.

Jackson and the nine other motorcyclists before entering Highway 701; a duty to yield to them before exiting the driveway of Cannon Glass Service and entering the northbound lane, where motorcyclists—including Mr. Jackson—had the right-of-way and were traveling approximately fifty-five miles per hour; and a duty to keep her car under proper control (i.e., proper control of the brake) so that she could stop and avoid colliding with Halstead and Joffrion, who were lawfully on the road riding in front of Mr. Jackson. *See* S.C. Code Ann. § 56–5–2350; *Epps*, 39 S.E.2d at 201; *Thomasko*, 561 S.E.2d at 599; *Johnson*, 698 S.E.2d at 841; *Williams*, 134 S.E.2d at 763; *Blanding*, 228 S.E.2d at 273; *Yaun*, 134 S.E.2d at 251. **Second**, Cole breached these duties when she accidentally exited the driveway, entered the northbound lane of Highway 701, and crossed into the oncoming motorcyclists' path of travel. At that point, it was foreseeable that her conduct would likely injure one or more of the motorcyclists, including Mr. Jackson. *See Horne*, 331 S.E.2d at 344. **Third**, Cole's breach of her duties proximately caused Mr. Jackson to lose control of his motorcycle when he swerved to avoid a collision, resulting in him spilling onto the roadway and sustaining fatal injuries.

18. However, the Court finds Defendant has proven by a preponderance of the evidence that Mr. Jackson was slightly negligent and that his own negligence was a contributing proximate cause of his fatal injuries. **First**, although Mr. Jackson had the right-of-way and was "under no duty to anticipate" Cole's negligent acts, *see Kennedy*, 153 S.E.2d at 317, he still had a duty to adjust his speed to ensure he was operating safely on a damp road, a duty to maintain a safe following distance between his motorcycle and the motorcycles in front of him so that he could safely slow down, stop, or turn his motorcycle, and a duty to keep a reasonable lookout to avoid hazards on the highway. *See* S.C. Code Ann. §§ 56–5–1520(A), (F), 56–5–1930(A); *Epps*, 39 S.E.2d at

201; *Thomasko*, 561 S.E.2d at 599; *Johnson*, 698 S.E.2d at 841; *Yaun*, 134 S.E.2d at 251.

***Second***, Mr. Jackson breached these duties by following Halstead and Joffrion too closely on a damp road, which prevented him from having adequate time to safely slow down, stop, or turn his motorcycle without losing control once he had the visual cues that Strickland and Halstead were taking evasive maneuvers as Cole's vehicle entered the roadway. ***Third***, Mr. Jackson's breach of his duties proximately contributed to a slight degree to his fatal injuries. However, the Court has weighed and compared the respective contributions of each person to the occurrence, and concludes that Cole's negligence far exceeded that of Mr. Jackson. The Court assigns the degree of negligence attributable to Cole (i.e., Defendant) as 90% and that attributable to Mr. Jackson as 10%.

19.    At trial, Plaintiff argued the "sudden emergency" doctrine and *Horton v. Greyhound Corp.*, 128 S.E.2d 776 (S.C. 1962), negated any finding or inference of negligence by Mr. Jackson. However, the South Carolina Supreme Court has clarified the narrow scope of *Horton*:

> [A] judgment as a matter of law pursuant to *Horton* and its progeny is proper only in the exceedingly rare case when the evidence, viewed in the light most favorable to the non-moving party, shows that the speed of a vehicle could not have contributed to the cause of the accident. "Of course, **in most automobile accident cases, speed creates imponderable issues of time and distance which must be resolved by the [factfinder]**." *Tubbs by Duren v. Bowie*, 417 S.E.2d 550, 552 (S.C. 1992).

*Clark v. Cantrell*, 529 S.E.2d 528, 538–39 (S.C. 2000) (emphasis added). Unlike *Horton*, the instant case deals with following too closely (not speeding) and presents evidence of negligence by *both* the defendant and the plaintiff (although the defendant's negligence far outweighed the plaintiff's).

36

Similarly, the sudden emergency doctrine is inapplicable to the facts of this case. "When the driver of an automobile is confronted with a sudden emergency *brought about by the negligence of another and not by his own negligence*, and is compelled to act instantly to avoid a collision or an injury, that driver is not guilty of negligence if he makes such a choice as a person of ordinary prudence placed in a like position might make, even though he did not make the wisest choice." *Id.* at 540 (alterations omitted). "The sudden emergency doctrine is intended to protect a driver who, while acting with due care, suddenly finds herself in an emergency situation due to the negligent or wrongful acts of another. The doctrine does not apply when a party's own negligence creates the very emergency in which she finds herself." *Id.* Here, the sudden emergency doctrine does not apply because Mr. Jackson's own negligence, though slight, still helped create the very emergency in which he found himself.

IV.   **Damages**

20.   For claims brought under the FTCA, damages are determined by the law of the state where the tortious act was committed, subject to the limitation that the United States shall not be liable for interest prior to judgment or for punitive damages. 28 U.S.C. § 2674; *Hatahley v. United States*, 351 U.S. 173, 182 (1956). "The South Carolina Wrongful Death Act, S.C. Code Ann. § 15–51–10, *et seq.*, (1976) governs the measure of damages under the Federal Tort Claims Act for the wrongful death of a South Carolina decedent due to the negligence of an agent of the United States." *Springer v. United States*, 641 F. Supp. 913, 938 (D.S.C. 1986), *aff'd*, 819 F.2d 1139 (4th Cir. 1987). The Court finds Plaintiff and her two children, Cacey and Hunter Jackson, are the statutory beneficiaries for whose benefit this action is brought.

21.   The following damages are recoverable in a wrongful death action: "(1) pecuniary loss, (2)

mental shock and suffering, (3) wounded feelings, (4) grief and sorrow, (5) loss of companionship, and (6) deprivation of the use and comfort of the intestate's society, including the loss of his experience, knowledge, and judgment in managing the affairs of himself and of his beneficiaries." *Burroughs v. Worsham*, 574 S.E.2d 215, 227 (S.C. Ct. App. 2002). The Court is mindful that "[i]t is quite impossible to fix with anything approaching mathematical certainty the damages which one may suffer from the wrongful death of a father or husband, or to place a measure upon the grief which accompanies it." *Norwood v. Atl. Coast Line R. Co.*, 27 S.E.2d 803, 809 (S.C. 1943). "In a wrongful death case, the issue of damages is not directed toward the value of the human life that was lost, but rather the damages sustained by the beneficiaries as a result of the death." *Welch v. Epstein*, 536 S.E.2d 408, 421 (S.C. Ct. App. 2000).

22.     "Generally, in order for damages to be recoverable, the evidence should be such as to enable the court or jury to determine the amount thereof with reasonable certainty or accuracy. While neither the existence, causation nor amount of damages can be left to conjecture, guess or speculation, proof with mathematical certainty of the amount of loss or damage is not required." *Whisenant v. James Island Corp.*, 281 S.E.2d 794, 796 (S.C. 1981); *see Smith v. Wells*,188 S.E.2d 470, 471 (S.C. 1972) (discussing damages in a wrongful death action and stating "only such future or prospective damages may be recovered as the evidence renders it reasonably certain will of necessity result from the alleged injury").

       **A.     Pecuniary Loss**

23.     "Expert witnesses may testify whenever special knowledge will assist the trier of fact." *Sparks v. Gilley Trucking Co.*, 992 F.2d 50, 53 (4th Cir. 1993) (citing Fed. R. Evid. 702). Federal

Rules of Evidence 104 and 702 as well as relevant case law require a federal court to screen proposed expert evidence to ensure that it is sufficiently reliable and likely to assist the factfinder in order to be admissible at trial. *See Daubert*, 509 U.S. at 592–97; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

24.     "Expert testimony must be 'based on sufficient facts or data,' and the expert must arrive at his opinions by properly applying 'reliable principles and methods' to the facts." *Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476, 480 (4th Cir. 2018) (quoting Fed. R. Evid. 702). "[Q]uestions regarding the factual underpinnings of the expert witness' opinion affect the weight and credibility of the witness' assessment, not its admissibility." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (internal quotation marks and alteration omitted).

25.     As explained in full above, the Court finds Dr. Wood's testimony regarding Mr. Jackson's lost earning capacity is too speculative and not sufficiently reliable, and therefore the Court concludes Plaintiff is not entitled to a damages award for lost future earnings.

26.     However, the Court finds Dr. Wood's opinion regarding the value of lost family/household services is sufficiently reliable, and therefore Plaintiff is entitled to an award of damages for loss in family services in the amount of $120,389.

### B.     Non-pecuniary Loss

27.     Based on the testimony thoroughly summarized above, it goes without saying that Mr. Jackson was a devoted and loving father and husband as well as a beloved member of his community. Taking into account the mental shock and suffering experienced by Mr. Jackson's family (i.e., Mrs. Jackson, Hunter, and Cacey), their wounded feelings, their grief and sorrow, the loss of Mr. Jackson's companionship, and the deprivation of his society, the Court concludes an

appropriate damages award for the beneficiaries' non-pecuniary loss is four million dollars ($4,000,000).

### C. Funeral Expenses

28. By statute, South Carolina law provides plaintiffs may recover funeral expenses in a wrongful death action. *See* S.C. Code Ann. § 15–5–100. Thus, Plaintiff is entitled to $11,527.08 in funeral expenses.

### D. Reduction in Damages

29. The Court will reduce Plaintiff's total damages by 10% to account for Mr. Jackson's slight degree of comparative negligence/fault.

## V. Summary

30. Clearly, the statutory beneficiaries here are entitled to appropriate compensation for their losses. This was a tragic accident, and the Court takes this opportunity to humanize the grievous loss suffered by Mr. Jackson's family and also to reflect on the fallibility of human nature. A United States Postal Service carrier was on the first day of her mail route by herself when she missed a turn. Cole was raising two small children and was working multiple jobs in addition to carrying mail. One of those other jobs was an EMT-paramedic. In fact, Cole's testimony revealed that immediately after the accident, her EMT training kicked in and she attempted to save Mr. Jackson with CPR. The tragic irony of Ms. Cole, a first responder, rushing to the aid of Mr. Jackson, another first responder, is not lost on the Court, and it tugs at one's heartstrings to think the two could very well have been friends had circumstances been different. The Court has the highest regard for first responders and their mutual respect for one another, and it emphasizes Cole's testimony was very credible regarding her memory and explanation of what

happened and how it happened—purely by accident. There was no malice or willfulness on her part; rather, this case simply involved a new postal driver trying to operate her vehicle as she was trained—awkwardly by sitting in the center console area and attempting to steer the car with her left hand and foot. Cole resigned from her job shortly after the accident and lives with the memory of this event daily. Likewise, Mr. Jackson's family lives daily with the loss of a husband and father. The respect and love he garnered in his community was well-apparent by the extraordinary funeral procession, which served as a final salute to him as a first responder.

## Conclusion

Based on the foregoing Findings of Fact and Conclusions of Law, the Court hereby:

(1)     **DENIES** Plaintiff's motion in limine [ECF No. 50];

(2)     **FINDS** that Defendant was 90% negligent or at fault and that Plaintiff's decedent Jerry D. Jackson, Jr. was 10% negligent or at fault, and therefore will **REDUCE** Plaintiff's total damages by 10%;

(3)     **FINDS** Plaintiff is entitled to pecuniary damages in the amount of $120,389, non-pecuniary damages in the amount of $4,000,000, and funeral expenses in the amount of $11,527.08;

(4)     **REDUCES** the total damages amount of $4,131,916.08 by 10% (i.e., by $413,191.61) to account for Mr. Jackson's slight degree of comparative negligence; and

(5)     **DIRECTS the Clerk to enter judgment in favor of Plaintiff Kimberly L. Jackson, Administratrix of the Estate of Jerry D. Jackson, Jr., against Defendant United States of America in the amount of <u>$3,718,724.47</u>.**

**IT IS SO ORDERED.**

Florence, South Carolina                    s/ R. Bryan Harwell
April 12, 2018                              R. Bryan Harwell
                                           United States District Judge